1
2
3
4

MORGAN, LEWIS & BOCKIUS LLP
Nathan J. Hochman (SBN 139137)
nathan.hochman@morganlewis.com
2049 Century Park East, 7th Floor
Los Angeles, CA 90067
Tel:   +1.310.255-9025
Fax:   +1.310.907.2000

5
6
7
8

LAW OFFICES OF MARC S. NURIK
Marc S. Nurik (SBN 297951)
marc@nuriklaw.com
1551 Manning Ave., Suite 302
Los Angeles, CA  90024
Tel:  +1.310.909.6828

9
10

Attorneys for Defendant
Marc Mani

11

UNITED STATES DISTRICT COURT

12

CENTRAL DISTRICT OF CALIFORNIA

13
14

UNITED STATES OF AMERICA,

15

Plaintiff,

16

v.

17

MARC MANI,

18

Defendant.

19
20

No. 17-322-RGK

DEFENDANT MARC MANI'S
SENTENCING POSITION;
EXHIBITS

Date:        September 17, 2018
Time:        10:00 a.m.

21
22
23
24
25
26
27
28

DB2/ 34482678.1

1    Defendant Marc Mani, by and through his counsel of record, hereby

2  respectfully submits his Position re: Sentencing in this matter.  This sentencing

3  position is based upon the attached memorandum of points and authorities and

4  exhibits, the Presentence Report, the files and records of this case, and any such

5  argument as may be heard by the Court.

6   DATED:  September 13, 2018

7

8                                        Morgan, Lewis & Bockius LLP

9

10                                       By:        /s/ Nathan J. Hochman

11                                                   Nathan J. Hochman

12                                            Attorneys for Defendant
                                                 Marc Mani

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

_____
MARC MANI'S SENTENCING POSITION CR 17-322-RGK

DB2/ 34482678.1

1

# TABLE OF CONTENTS

2

**Page**

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

I.     INTRODUCTION ............................................................................1

II.    NO OBJECTIONS TO PRESENTENCE REPORT ...........................5

III.   ANALYSIS OF SENTENCING FACTORS .....................................5

    A.     History and Characteristics of the Defendant (§ 3553(a)(1)) ..............7

        1.     Personal Background and Acceptance of Responsibility ........7

        2.     Character Letters...............................................12

    B.     Nature and Circumstances of the Offense (§ 3553(a)(1))..................18

    C.     The Need for the Sentence Imposed to: ...........................20

        1.     Reflect the seriousness of the offense, promote respect for the law and provide just punishment (§ 3553(a)(2)(A))................................................20

        2.     Afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) ...........................................21

        3.     Protect the public from future crimes of the defendant (§ 3553(a)(2)(C)) ...........................................23

        4.     Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner (§ 3553(a)(2)(D)) ......23

    D.     The Kinds of Sentences Available (§ 3553(a)(3)) .............................23

    E.     The Advisory Guideline Range (§ 3553(a)(4)).................................23

    F.     Any Pertinent Policy Statement Issued By the Sentencing Commission (§ 3553(a)(5))....................................23

    G.     The Need to Avoid Unwarranted Sentence Disparities  (§ 3553(a)(6)) ..........................................24

    H.     The Need to Provide Restitution to Victims of the Offense  (§ 3553(a)(7)) ..........................................33

    I.     A Sentence of Probation with Home Detention and 1,500 Hours of Community Service Is Reasonable and Appropriate in this Case ....................................................34

IV.    CONCLUSION ............................................................34

23

24

25

26

27

28

1
2

# TABLE OF AUTHORITIES

**Page(s)**

3
4

**FEDERAL CASES**

5

*Gall v. United States*

6

552 U.S. 38 (2007)........................................................................5, 6, 21

7

*Kimbrough v. United States*

8

552 U.S. 85 (2007)...............................................................................5, 6

9

*Koon v. United States*
518 U.S. 81 (1996)....................................................................................5

10
11

*Pepper v. United States*
131 S. Ct. 1229 (2011)..............................................................................2

12
13

*Rita v. United States*
551 U.S. 338 (2007)..................................................................................6

14
15

*United States v. Adelson*
441 F. Supp. 2d 506 (S.D.N.Y. 2006) ...................................................16

16
17

*United States v. Carty*
520 F.3d 984 (9th Cir. 2008) (*en banc*)................................................23

18

*United States v. H. Ty Warner*
No. 13-cr-00731-CPK (N.D. Il.).............................................................25

19
20

*United States v. Ressam*
679 F.3d 1069 (9th Cir. 2012) ...............................................................24

21
22

*United States v. Warner*
792 F.3d 847 (7th Cir. 2015) .................................................................25

23

**FEDERAL STATUTES**

24

18 U.S.C. § 3553.....................................................................................24

25
26

18 U.S.C. § 3553(a) ...................................................................2, 5, 6, 34

27

18 U.S.C. § 3553(a)(1) ...................................................................5, 7, 18

28

-ii-

# TABLE OF AUTHORITIES
(continued)

Page(s)

18 U.S.C. § 3553(a)(2)(B) ...........................................................................21

18 U.S.C. § 3561(c)(1)................................................................................23

28 U.S.C. § 991(b)(1)(B) ............................................................................24

U.S.S.G. § 5K1.1 ..........................................................................................1

**OTHER AUTHORITIES**

U.S. Sentencing Commission, *2015 Sourcebook of Federal Sentencing Statistics*, Table 27A (http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2017/sourcebook-2017) ........................................................................................................24

**DEFENDANT'S SENTENCING POSITION**

## I.    INTRODUCTION

There is an old adage that there are two types of individuals who commit crimes: good people who make mistakes and bad people who get caught.  Dr. Marc Mani manifestly falls in the former category as a good person who made mistakes, accepted complete responsibility for them, fully cooperated in the government's ongoing investigation, entered into a pre-indictment plea agreement, and paid the IRS back in full (all taxes, interest, and penalties) -- and not a bad person who got caught.  Dr. Mani is 50 years old, has no prior criminal record, and with the exception of his involvement in the instant offense conduct, has led an extraordinarily productive, hard-working, and community-centered life.  He has been a licensed plastic surgeon for over 17 years, after having spent 10 years in medical school and surgical residencies, and has used his skills to build a successful Southern California practice as well as perform pro bono charitable plastic surgery operations on behalf of domestic violence victims, children and veterans.  His offense conduct consists of failing to file a disclosure form, a Report of Foreign Bank and Financial Accounts (an "FBAR" form or FinCEN Form 114), regarding his sole foreign account in Dubai in his own name for two years (2012-2013), and failing to pay tax on all of his income earned in Dubai where he would periodically see patients (2012-2014).  There is no allegation that Dr. Mani failed to report and pay all the tax from his Southern California practice nor is there any allegation that Dr. Mani committed any type of healthcare or any other violation related to his medical practice.

The Probation Officer has calculated a total offense level of 15, a criminal history category of I, and an advisory guideline sentencing range of 18-24 months. (Presentence Report ("PSR" ¶¶ 40, 45, 82).  In the Government's Position re Sentencing of Defendant, the government has recommended an additional two-level reduction of the total offense level based pursuant to U.S.S.G. § 5K1.1 based

1

1    on Dr. Mani's timely, truthful, significant, useful, reliable and substantial

2    cooperation against his accountant "JB," who knew about his Dubai account and

3    prepared the returns at issue that underreported the Dubai income.   If the Court

4    grants that two-level reduction, the total offense level would be 13, and the

5    advisory guideline range would be 12-18 months, in Zone C.

6         As elaborated herein, Dr. Mani respectfully submits that under all the factors

7    set forth in 18 U.S.C. § 3553(a), instead of a sentence of incarceration, a sentence

8    of probation with conditions including home detention and 1,500 hours of

9    community service ("Recommended Sentence") is "sufficient but not greater than

10   necessary" to achieve all the aims of sentencing.  More specifically, Dr. Mani

11   requests that the Court order Dr. Mani to serve the 1,500 hours of community

12   service by directly helping veterans and others through the non-profit organization

13   Face Forward in dire need of life-changing, plastic surgery operations who are

14   unable to otherwise afford such procedures.  Rather than have Dr. Mani spend his

15   time unproductively behind bars, he requests that he be able to make amends to

16   society for his transgressions by using his unique skill set to transform lives of

17   veterans suffering from disfiguring injuries that came from service to their country.

18        This case demonstrates in a compelling way why the Supreme Court rejected

19   mandatory application of the Sentencing Guidelines and returned discretion to the

20   district court "to consider every convicted person as an individual and every case

21   as a unique study in the human failings that sometimes mitigate, sometimes

22   magnify, the crime and the punishment to ensue." *Pepper v. United States*, 131 S.

23   Ct. 1229, 1239-40 (2011) (internal quotations and citations omitted).  The statutory

24   factors supporting the Recommended Sentence are outlined below.  Among other

25   factors in this case:

26   ●    Dr. Mani is a 50-year-old father of a 14-year old daughter (Erica),

27   who, prior to his offense conduct in this case, has led an honest, ethical,

28   productive, law-abiding, and community-oriented life.

2

1        ● The activities that form the offense conduct in this case involved one

2   foreign bank account opened in Dubai in Dr. Mani's own name (not in the name of

3   a foreign company or foreign trust or at multiple foreign banks as is typical for

4   these cases), and the account was opened for three years and closed before the

5   government's investigation begun.  While Dr. Mani failed to report all the income

6   earned in Dubai for three years, there is no allegation that he failed to accurately

7   report all of the income earned domestically in his Southern California practice nor

8   committed any other offense related to his practice.

9        ● Dr. Mani has an exceptional lifelong history of service as a surgeon,

10  teacher, mentor, and philanthropist.

11       ● Dr. Mani accepted full responsibility for his actions at the very onset

12  of the investigation, entered into a pre-indictment plea agreement, and fully,

13  truthfully, reliably and timely cooperated with the government's investigation of

14  his accountant JB.

15       ● Unlike many defendants in criminal tax cases that only start paying

16  their taxes and interest owed after being sentenced, Dr. Mani entered into a closing

17  agreement with the IRS for all years at issue and has paid in full prior to sentencing

18  the entire tax ($437,878) and interest ($128,239) owed.  By doing so, **Dr. Mani**

19  **has made the IRS, the victim of his tax offense, completely whole.**   In addition,

20  unlike many criminal tax defendants, Dr. Mani has paid all the civil fraud and

21  FBAR penalties assessed for his actions -- **$511,802 – which represents a**

22  **financial penalty of more than 100% of the taxes originally owed**.

23       ● In addition to this very severe financial penalty, Dr. Mani already has

24  been punished in this case by suffering irreparable damage to a reputation built

25  over a lifetime.  Dr. Mani will be a convicted felon for the rest of his life with all

26  the collateral restrictions that imposes.

27       ● The Recommended Sentence is necessary to avoid unwarranted

28  sentencing disparities with those convicted of similar conduct.  In particular, since

3

2009, the government has very actively prosecuted taxpayers with unreported offshore accounts.  The overwhelming majority of those taxpayers used a variety of financial structures to hide their foreign accounts from the U.S. government, including foreign companies and foreign trusts.  These taxpayers had multiple accounts in multiple banks under different names, often for over a decade, and transferred their funds often to avoid detection.  Many of the taxpayers had foreign accounts with well more than $1 million in them. In contrast, Dr. Mani had one foreign account at one foreign bank in his own name open for three years with approximately $400,000 in it at its height.  At sentencing, the majority of the over 70 taxpayers who have been prosecuted in this wave of prosecutions received non-imprisonment sentences including conditions of home detention, community service, and halfway house.  The Recommended Sentence would fit squarely within the spectrum of sentencing of similar defendants, particularly given the more egregious conduct many of them engaged in.

- Dr. Mani poses no risk to the public from further criminal conduct; and

- A sentence of imprisonment is not needed to provide specific or general deterrence.  With respect to specific deterrence, given that Dr. Mani's offense was over four years ago and he has done everything in his power to make amends for his misconduct, there is no indication that a sentence of imprisonment beyond the Recommended Sentence is necessary to deter Dr. Mani from committing future crimes.  Similarly, with regard to general deterrence, the government's own IRS study demonstrates that a sentence of imprisonment is not required to promote general deterrence provided that the defendant has been criminally prosecuted and at least receives a probationary sentence.

These and other factors, individually and in combination, demonstrate that the Recommended Sentence is "sufficient, but not greater than necessary," to

comply with the statutory goals of sentencing.  18 U.S.C. § 3553(a); *Kimbrough v. United States*, 552 U.S. 85, 109 (2007).

## II.    NO OBJECTIONS TO PRESENTENCE REPORT

Dr. Mani is not aware of any government objections to the Presentence Report disclosed on July 30, 2018 nor does he have any objections to the facts and general guideline calculations set forth in that report.  Dr. Mani notes that the Probation Officer stated in paragraph 95 in the section titled "Factors That May Warrant A Sentence Outside Of The Advisory Guideline System" that pursuant to 18 U.S.C. § 3553(a)(1), "among the factors that the Court shall consider in determining the particular sentence are the nature and circumstances of the offense and the history and characteristics of the defendant."

## III.   ANALYSIS OF SENTENCING FACTORS

The Court must impose a sentence consistent with the mandate of 18 U.S.C. § 3553(a).  The Sentencing Guidelines are only a starting point, one of many factors to be weighed when selecting a disposition that is sufficient but not greater than necessary to satisfy the purposes and goals set forth in 18 U.S.C. §3553(a). *Gall v. United States*, 552 U.S. 38, 49-50 (2007) (guideline range should not be presumed to be reasonable); *Kimbrough*, 552 U.S. at 90 (guidelines only "one factor among several courts must consider in determining an appropriate sentence").  Additionally, the Court is no longer hemmed in by the traditional departure analysis.  Rather, the primary objective for this, as any, sentencing is to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50.  As Justice Kennedy observed even pre-*Booker*, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique case study in human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

The "overarching provision" of 18 U.S.C. § 3553(a) is, of course, to impose a sentence *sufficient, but not greater than necessary*, to meet the goals of sentencing established by Congress. *Kimbrough*, 552 U.S. at 101. Those statutory goals include "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." *Id.*; *see* 18 U.S.C. § 3553(a). The statute further provides that, in determining the appropriate sentence, the court should consider a number of factors, including "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the sentencing range established" by the Guidelines, "any pertinent policy statement" issued by the Sentencing Commission pursuant to its statutory authority, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* "In sum, while the statute still requires a court to give respectful consideration to the Guidelines, *Booker* permits the court to tailor the sentence in light of other statutory concerns as well." *Kimbrough*, 552 U.S. at 101 (internal quotations and citations omitted). If a sentence other than imprisonment would be sufficient to meet the statutory goals of sentencing, then the Court *must* impose such an alternative because imprisonment would be a "greater than necessary" sentence. 18 U.S.C. § 3553(a).

In his concurring opinion in *Rita v. United States*, 551 U.S. 338, 367 (2007), Justice Stevens wrote: "I trust that those judges who have treated the Guidelines as virtually mandatory during the post-*Booker* interregnum will now recognize that the Guidelines are truly advisory." The decisions in *Kimbrough* and *Gall* have reinforced Justice Stevens' remark and the authority of district courts to fashion the sort of sentence that fits the crime and the individual.

MARC MANI'S SENTENCING POSITION CR 17-322-RGK

A.    **History and Characteristics of the Defendant (§ 3553(a)(1))**

1.    <u>Personal Background and Acceptance of Responsibility</u>[1]

Dr. Mani grew up in Abilene, Texas.  His father had immigrated from India on his own, originally planning to become a priest and deciding upon medicine as a profession.  His father was very driven and a workaholic, and as Dr. Mani got older, his father was often very verbally abusive with him and much more so with his mother.  However, one of the things his father always said was that people should pay their taxes and not complain; Dr. Mani writes that these are words "whose sting I feel every time I think about my mistake."

Despite growing up in a small town in West Texas, Dr. Mani set his sights very high.  As Dr. Mani states: "I asked my father at ten years old what the best college was in the US. When he told me Harvard, I decided that is where I wanted to go.  I worked as hard as I could through high school and I was very lucky to gain admission there."

While in college, Dr. Mani was struck by the homeless population in the Boston area. Beginning his sophomore year, he began volunteering several hours per week working for Greater Boston Legal Services' Housing Unit, trying to prevent unjust evictions and homelessness.  He worked during the summer after sophomore year for Legal Services under a volunteer fellowship program at the John F. Kennedy School of Government.  He also ran a committee to help place other interested students in similar positions throughout Massachusetts.  Dr. Mani describes this work as teaching him "how much I loved the feeling of being helpful to people and how carrying that feeling through whatever I did would be the most meaningful thing I could do with my life."

After college, Dr. Mani pursued his passion to help others and went to the Baylor College of Medicine set on becoming a surgeon.  Once he saw his first

---

[1] This Personal History section is derived from Dr. Mani's Letter to the Court, attached herein as Exhibit 1.

cancer reconstruction operation and the ultimate skills required to do it, Dr. Mani knew plastic and reconstructive surgery was his calling.  This field combined Dr. Mani's scientific skills with his artistic skills, which has been key to his success in and passion for plastic surgery.

After graduating medical school in 1995, Dr. Mani completed a three-year General Surgery residency at Baylor College of Medicine Affiliated Hospitals. This period of regularly working more than 100 hours per week included the full range of surgery, but the part that stood out for Dr. Mani was running the second-busiest trauma center in the U.S. as the Chief of the Ben Taub emergency room. This was during a fairly violent time in the city of Houston where many evenings saw multiple car accident and gun shot or stabbing victims come in in extremis. Being in a position to triage and treat them, often helping them survive or resuscitating them after several minutes of CPR in an ambulance, was something he found more rewarding than any other experience he previously had.  The responsibility it required of him changed Dr. Mani as a person by showing him "the deep satisfaction of giving everything you have in a way that provides a needed service and can save someone's life."

Following this General Surgery residency, Dr. Mani completed a three-year residency in Plastic and Reconstructive Surgery at Baylor, which was one of the most demanding and thorough residencies in the country.  The most memorable part of this residency for Dr. Mani was serving as Chief Resident at the Veterans Administration Hospital.  He spent eight months running the reconstructive surgery service.  Since it was often difficult to find senior staff to help out, Dr. Mani performed the great majority of these complex operations on his own with junior residents assisting.   Restoring form and function to veterans with war injuries and other issues, like skin and head and neck cancer which were usually related to their service, "allowed me [Dr. Mani] to see and appreciate more first-hand the lifelong sacrifice they make."

8

Afterwards, Dr. Mani came to Los Angeles to practice plastic surgery and joined Dr. Neal Handel, considered one of the most talented, honest and ethical surgeons in the field.  Alongside Dr. Handel, Dr. Mani started his own practice in 2001 and worked 12-14 hour days to build up that practice.  Over the years, that practice grew by word of mouth and direct referrals.  As a result of having built a successful practice, Dr. Mani was recruited to practice in Dubai in 2011.  From the start, his practice in Dubai was very busy so that he performed over 20 operations during the five business days he went over there, making 6 trips per year.  It was at this high point of his career when he opened up an account in Dubai and made the "very stupid and regretful decision" not to report it, or the income made in Dubai, on his tax returns and not pay the tax generated by this income.

As Dr. Mani made this decision, he "knew deep down that it was wrong." Since Dr. Mani's accountant JB was fully aware of the Dubai account and the Dubai income and prepared his tax returns leaving the account and most of the income off, Dr. Mani errantly thought that "I was protected if I was ever caught." Dr. Mani had gone to another accountant who wanted him to report everything but when he found JB, the CPA who said he didn't need to, Dr. Mani forthrightly admits that "I mistakenly agreed with him even though I knew what I was doing was wrong."  To make amends for that misconduct, Dr. Mani has done all he can to cooperate in the government's investigation of JB over the past two years, answering all their questions during two proffer meetings and providing them with all of his documents, emails, financial and bank statements inculpating JB in the crimes he committed with Dr. Mani.

Over the years, in addition to working with his patients here and in Dubai, Dr. Mani has lectured and taught other plastic surgeons in many different foreign countries.  He has published numerous papers on facial aesthetic or reconstructive surgery, particularly with respect to facial nerve reconstruction after trauma or cancer, and has reviewed articles on facial anatomy for the main academic plastic

9

1  surgery journal as an expert in this area.

2         Much more rewarding for him, though, as Dr. Mani relates, have been the

3  opportunities to use his expertise to help those less fortunate.  For Dr. Mani, his

4  experience with his mother and what she endured makes the care of domestic

5  violence victims a very personal mission for him.  From an early point in his

6  practice, he has provided pro bono reconstructive surgery to victims of domestic

7  abuse, both in Los Angeles and in Dubai.  He has worked with the Children's Burn

8  Foundation of Los Angeles since 2005 and the non-profit organization Face

9  Forward since 2011, regularly operating on burn victims and other victims of

10  domestic violence and other crimes pro bono.  He has consistently dedicated over

11  the years ten percent of his practice to this type of surgery.  He has worked with

12  the women and families at Good Shepherd Shelter of Los Angeles by speaking to

13  them as a group and providing reconstructive surgeries for their domestic abuse-

14  victim clients in need.  Move to End Domestic Violence, a national organization

15  that works locally with Good Shepherd Shelter to provide free moving services to

16  women in situations of abuse, appointed Dr. Mani a Global Ambassador based on

17  the work he has done in this area.  As Dr. Mani writes: "It is hard to describe the

18  personal joy and satisfaction I receive from helping a young burn victim deal with

19  her tragedy by reconstructing her face, often with improved ability to see, speak,

20  eat, and walk forward with confidence.  Operating on many young victims of

21  severe facial burns is enough to make anyone stop complaining about their own

22  problems – particularly myself, whose main problem is of my own doing."

23         As part of this charity work, Dr. Mani has begun performing a cutting-edge

24  procedure to improve severe burn scarring using patients' stem cells from their

25  own fat.  He has begun to use this technique successfully on acid burn victims and

26  civilian victims of burns and shrapnel in the Syrian war who come in under the

27  care of Face Forward.

28         Aside from his medical work, Dr. Mani states that "my most important focus

10

right now is my incredibly sweet and gifted daughter Erica." Erica is fourteen years old and lives with her mother; Dr. Mani has custody during holidays and half of the summer.   As Dr. Mani states: "Erica has ambitions to be a surgeon herself. I never got to observe my father operating when he was alive and practicing, so I've made it a point to have Erica come into surgery with me many times.  She is the light of my life, and I have spent my life trying to set a good example for her. The failure to do that embodied in what I've done with my taxes is perhaps more painful than what my own conscience does to me. But I know that she sees the work I do and looks up to me, and I hope to use the mistakes I have made as a teaching moment for her not to repeat those mistakes, not to try to take short cuts or try to get away with things, and not to avoid the obligation to pay taxes."

Dr. Mani has fully accepted responsibility for his misconduct in actions and in words.  In action, at the onset of the government's investigation, he agreed to plead guilty and entered into a pre-indictment plea agreement, saving the government countless hours of having to complete its investigation involving a foreign bank account.  He fully cooperated against accountant JB, answering all the questions posed by the government and providing them with all information and documentation they requested.  Since making the IRS financially whole for his crimes was a "high priority" for Dr. Mani, he entered into closing agreements for all years at issue with the IRS and more importantly paid all of his taxes and interest before sentencing.  Indeed, he also paid an over 100% civil fraud and FBAR penalty of over $500,000 prior to sentencing.  Thus, in action, Dr. Mani has taken every step possible to accept responsibility and make amends for his crimes. In words, Dr. Mani fully understands the gravity of his wrongs and has accepted responsibility for them.  As he writes: "I clearly made a very serious mistake that I will pay for the rest of my life, personally and professionally. . . . to say that I am racked with guilt about doing such a stupid thing as I did would be an understatement. . . . I know I have engaged in criminal misconduct on my taxes. . .

11

1   . I will pay for these crimes personally since I will be a publically branded,

2 convicted felon for the rest of my life."

3                2.    <u>Character Letters</u>

4       As reflected in the numerous letters submitted on his behalf and attached

5 herein as Exhibits 2-11, Dr. Mani is a widely respected man who has made the

6 most of the opportunities given to him while consistently being a contributing

7 member of his community.  He has earned over the last 20 years a reputation for

8 honesty and integrity among his peers, patients, and friends.  He has engaged in

9 philanthropy not only through raising and donating generous sums to charitable

10 organizations, but also through the gift of his time and surgical skills to those in

11 need.

12       The letters of Dr. Mani's patients, colleagues, friends and family attest to the

13 exemplary aspects of Dr. Mani's character and speaking glowingly of his integrity,

14 honesty, ethics, values, compassion, and commitment to those less fortunate.  The

15 letters collectively paint a picture of a fundamentally good and honorable person, a

16 loving and devoted father, an ethical and respected physician, and an active and

17 generous contributor to his community.

18       Dr. Gary Alter, a friend and colleague of Dr. Mani's for over 17 years,

19 writes of the esteem with which he holds Dr. Mani personally and professionally

20 (Exhibit 3):

21

22         On the personal side, I know Marc very well. . . He has always
        handled himself with the utmost dignity and dependability. I have

23         never seen any dishonest tendencies in his interpersonal relationships
        with friends or casual acquaintances. . .[On the work side] I have

24         always been impressed by Marc's plastic surgical knowledge and
        inventive skills.  He has been on the forefront of many plastic surgery

25         innovations.  I have watched Marc perform surgery and can vouch
        for his gifted surgical skills. . . .He has taken these gifts not only to

26         his paying patients but also to other unfortunate patients through
        various charities. . . As a plastic surgeon with unique talent, he

27         realizes the responsibility to give back to others.

28

Lynda Barens, a long-time friend and plastic surgery patient coordinator, writes about very personal experiences she has witnessed involving Dr. Mani including when Dr. Mani spent the extra time and went the extra distance to help her 94-year old mother through plastic surgery; or when Dr. Mani helped her during her nine-day stay at Cedar Sinai when she was rushed there to the emergency room, despite the fact that Dr. Mani was not her doctor; or that Dr. Mani never forgets the day that Ms. Barens lost her son and helps her deal with the pain every year.  (Exhibit 4).

Kelly Day, a friend and patient, describes the "exceptional relationship" she has observed Dr. Mani has with his daughter Erica and how losing this bond would be "extremely detrimental" for Erica.  (Exhibit 5).  Ms. Day has had many conversations with Dr. Mani and has witnessed that "he is extremely remorseful and regrets all that has transpired . . . Dr. Mani made a grave mistake.  He knows it, and emotionally is dealing with it every day.  But, he is one of the finest, caring and talented doctors I have ever had the pleasure of knowing."

Dr. Neal Handel, a plastic surgeon for 40 years whose practice Dr. Mani joined in 2001 and who has been a mentor to Dr. Mani, writes that he has been impressed over the years by the quality of Dr. Mani's character, his integrity and sincerity.  (Exhibit 6).  Dr. Handel has had multiple "heart-to-heart" conversations with Dr. Mani about his criminal conduct and notes that Dr. Mani is "truly remorseful" for his actions and that this has been an "extremely humiliating experience" for Dr. Mani.  Like others who have written letters to the Court, Dr. Handel respectfully asks the Court to impose a sentence on Dr. Mani that would allow him to continue "to use his skills as a physician and surgeon for the benefit of patients and the community as a whole."

13

1
      Chad Johnson, a lawyer and one of Dr. Mani's closest friends for over 30

2
years, writes poignantly about how Dr. Mani's patience, generosity, caring and

3
sacrifice helped Mr. Johnson survive a difficult and potentially suicidal period in

4
his life.  (Exhibit 7).  "Marc Mani was my initial and indispensable rock," Mr.

5
Johnson states.  Mr. Johnson also describes how Dr. Mani's charitable efforts

6
going back 30 years to college and continuing until today have inspired him to

7
perform charitable work.  Mr. Johnson observes that Dr. Mani is "responsible,

8
remorseful, improved, and I hope on balance, deserving in your eyes of a second

9
chance at this critical and formative time in his life, his fatherhood, and his career .

10
. .With a degree of targeted, purposeful leniency [allowing Dr. Mani to serve his

11
sentence through community service to others less fortunate], I fully believe Marc

12
will make you proud . . .This has been his path but for this terrible mistake."

13
      Dr. M H Khan, the Medical Director of the American British Surgical &

14
Medical Centre in Dubai, who has known Dr. Mani for the last 8 years, joins the

15
chorus of others when he writes that Dr. Mani is a "compassionate, hardworking,

16
committed and talented doctor. . . .dedicated to helping others."  (Exhibit 8).  Dr.

17
Khan remarks about Dr. Mani being "the first to offer his services on a pro bono

18
basis to anyone genuinely in need and always available to his patients throughout

19
the period of time whilst under his care."  Dr. Khan has witnessed that Dr. Mani

20
"on countless occasions [has] helped patients who have been victims of domestic

21
violence, accidents or genetic malformation – often for no personal reward or

22
gain."  Having heard Dr. Mani acknowledge his wrong doing, Dr. Khan is

23
convinced that Dr. Mani "has learned from his experience and will certainly do

24
everything he can to make right the wrongs of the past."

25
      Rocky Malnotra, a close friend of Dr. Mani's for the past 7 years, writes

26
about how Dr. Mani has been there for him as well as coming to the aid of friends

27
with medical issues often after hours and without asking for payment.  (Exhibit 9).

28

14

1    Mr. Malnotra has heard directly from Dr. Mani about how Dr. Mani "feels

2    profound remorse over his serious error in judgment" which Mr. Malnotra notes is

3    "very uncharacteristic" for Dr. Mani.  Mr. Malnotra further states that Dr. Mani

4    "places a very high priority on using his skills and medical knowledge to help

5    those less fortunate."

6         Mark Rothman, the former CEO of Good Shepherd Shelter of Los Angeles

7    and friend of Dr. Mani, writes about how Dr. Mani came to the shelter to talk to

8    woman and children who suffered from domestic violence.  (Exhibit 10).  "I

9    watched Marc give a presentation to a group of all the clients during one of his

10   visits.  I was particularly impressed with his honesty in letting the shelter's clients

11   know he had experienced domestic violence first hand in the home in which he

12   grew up. . . Ultimately he was able to help our clients who required reconstructive

13   care either by performing surgery . . . or connecting them with other appropriate

14   providers."  Mr. Rothman notes that he believes "Marc to be on a path towards

15   correcting the mistakes he made, through the service he is committed to providing

16   to domestic violence victims and to veterans."

17        Alex Casilano, a business owner and friend of Dr. Mani's for over 10 years,

18   has spoken to Dr. Mani often about his crimes and knows that Dr. Mani's "guilt

19   and remorse are very profound."  (Exhibit 11). He describes how Dr. Mani's

20   character and charitable actions have been an "example" to him and his son.

21   Knowing the potential that Dr. Mani has to help the community, Mr. Casilano

22   states to the Court: "Having [Dr. Mani] continue doing these [charitable surgery

23   for those less fortunate] . . .would in my opinion be of much more use to society

24   than having him in prison."

25        The letters submitted by those who know Dr. Mani best speak with one

26   voice of his integrity, his ethics, his values, and his devotion to his community, the

27

28

DB2/ 34482678.1

less fortunate, family and friends.  As he has fully acknowledged, Dr. Mani made a significant mistake and fell prey to a lapse in judgment – a lapse that represents an aberrant deviation from a lifetime of honesty, integrity, and service to his patients and his community.

Dr. Mani respectfully asks the Court to consider his letter, the letters submitted on his behalf, and the totality of his life to place his mistakes in context when determining an appropriate sentence.  As one court has stated:

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

3.    Recommended Sentence

The Recommended Sentence that Dr. Mani respectfully requests the Court to consider is a non-imprisonment sentence of probation with conditions of home detention and 1,500 hours of community service.  With respect to the community service, Dr. Mani would like to present to the Court a particular program – Face Forward Veterans -- that will allow him to use the unique skill set in plastic surgery he has developed over the past 20 years to directly help veterans and others suffering from significant disfiguring injuries having returned home from war after serving their country.  The need for such a doctor is tremendous, particularly one that will have the time (even if it is court-ordered) to provide consistent treatment over many years to hundreds of patients.

Face Forward is a non-profit organization that has worked in this area since 2007 providing plastic surgery operations to those suffering from these physical injuries who are not able to afford such procedures, in particular victims of

16

1   domestic violence, human trafficking and other criminal acts.  It was co-founded

2   by Dr. David Alessi, a prominent facial plastic and reconstructive surgeon who

3   was the former Chairman of Otolaryngology/Facial Plastic Surgery at Cedars-Sinai

4   Medical Center, and his wife Deborah Alessi.   (Exhibit 2).  Dr. Alessi has known

5   and worked with Dr. Mani at Face Forward since 2011.  Dr. Alessi's desire to

6   work with Dr. Mani was based on his reputation as well as Dr. Mani's passionate

7   desire to help others:

8   
9   > I don't know of a more charitable, compassionate and honorable
> physician in the community than Dr. Mani.  He has the utmost respect
10  > among his peers and a decades-long and very solid reputation for
> honesty and the highest character as a medical professional and as a
11  > person. . . . Beyond just the practice of plastic and reconstructive
> surgery, Dr. Mani has gained an international academic reputation as
12  > an expert on very complex facial anatomy, with multiple publications
> in the top peer-reviewed academic journals.
13  
14  
15  Dr. Mani has worked with Dr. Alessi at Face Forward to provide pro bono

16  care to numerous patients who are victims of burns and domestic violence; Dr.

17  Alessi is also aware of Dr. Mani's pro bono plastic surgery work for the Good

18  Shepherd Shelter for domestic abuse victims.

19  Through Face Forward, Dr. Alessi has developed a program, Face Forward

20  Veterans, that will "provide free reconstructive surgery to veterans to help them

21  recover from disfigurements occurring during their service and return to full and

22  complete lives."  While they have funding for the program, such a program

23  requires a hard commitment of a very significant amount of time at no charge from

24  a qualified reconstructive surgeon with experience in the types of serious

25  disfigurements facing veterans.  (Exhibit 2, Resolution of Face Forward).  Having

26  worked with Dr. Mani for years, Dr. Alessi is aware that Dr. Mani has the very

27  unique skill set required for the program, having previously run the reconstructive

28  surgery service for the Houston Veterans Administration and acquired the

1   necessary experience with the medical and reconstructive surgical needs of

2   veterans.  Dr. Mani is also one of the pioneers in developing and using a cutting-

3   edge Minimally Invasive Stromal vascular fraction (MIST) procedure which can

4   provide dramatic improvement in burn scars suffered by veterans.  As Dr. Alessi

5   writes, he does not know of "a more qualified surgeon to treat these patients and

6   run this new program" than Dr. Mani.

7       If the Court is willing to order Dr. Mani to serve 1,500 hours of community

8   service to Face Forward Veterans, the program will go forward; otherwise, it will

9   not since it is almost impossible to find a similar skilled plastic surgeon willing to

10   commit 1,500 hours pro bono.  As Dr. Alessi notes, the potential impact this

11   program will have on the lives of hundreds of veterans who have not been able to

12   get treatment for facial and other burns beyond acute care cannot be overstated.

13   Moreover, he will personally be in charge of the program and take responsibility to

14   verify Dr. Mani's participation hours in the program; he will report back to the

15   Court as often as it would like to advise the Court about Dr. Mani's participation

16   and the program's impact on the lives of veterans.  This program offers the Court

17   the chance to have Dr. Mani directly and substantially serve the society he harmed

18   through his tax offenses rather than sit unproductively in a prison.

19       **B.    Nature and Circumstances of the Offense (§ 3553(a)(1))**

20       Dr. Mani pleaded guilty to willfully failing to file an FBAR disclosing his

21   bank account in Dubai in 2012-2013.  In addition, Dr. Mani agreed as part of his

22   pre-indictment plea agreement that he did not report and pay tax on most of his

23   Dubai income in  2012-2014.  As part of his cooperation efforts, Dr. Mani detailed

24   for the government the "where, when, why, what, and how much" concerning the

25   establishment of the Dubai account and the manner in which his accountant knew

26   about the account and prepared tax returns that omitted the Dubai income from the

27   account.  As Dr. Mani has stated, there is no excuse for his unquestionably serious

28   criminal conduct, and he makes none.  He failed to report the foreign account and

18

income, and he has accepted full responsibility for his actions. It is important, however, in understanding the nature and circumstances of those actions, to view them in context.  Unlike most of the over 75 individuals that the government has prosecuted in its wave of offshore bank prosecutions starting in 2009,

* Dr. Mani did **not** use a **foreign company** (e.g., Cayman Islands, Panama) or **foreign trust** (e.g., Liechtensteinian stiftung) or **foreign board of directors** to set up the foreign account to hide his connection to it; instead, he set up the account in his own name;

* Dr. Mani did **not use multiple foreign accounts in multiple foreign banks** to hide his connection to the money or transfer funds among accounts to make detection less likely; instead, he set up one foreign bank account at one bank in his own name;

* Dr. Mani did **not** have **millions of dollars in the foreign accounts** nor did he have those accounts **opened for decade(s)**; instead, he had at its height $400,000 in the one foreign account that was opened for two years and did not pay over $400,000 in tax on foreign income over three years.

* Dr. Mani did **not hide his foreign account or income from his accountant**; instead, he fully disclosed his foreign account to his accountant JB, who had been practicing for over 35 years, and who also arranged through his company to directly receive a wire transfer from the foreign account as payment for a second trust deed; Dr. Mani has fully cooperated in providing incriminating information against accountant JB to the government in furtherance of its investigation of him for preparing false and fraudulent returns.

* Dr. Mani did **not** use **fraudulent "back-to-back" loans** with a local branch of the foreign bank (e.g., Bank Leumi) or a **credit card from the foreign bank** to access his funds in the foreign account; instead, he directly wire transferred the majority of those funds to a U.S. company controlled by his accountant JB.

19

The fact that Dr. Mani did not undertake most of the actions that other individuals who committed offshore tax evasion committed does not in any way excuse his misconduct or understate its seriousness. However, in considering where in the spectrum of offshore tax crimes his offense conduct falls, the lack of such aggravating actions militates strongly in favor of Dr. Mani's misconduct falling on the lower part of the spectrum, thus justifying the Recommended Sentence as compared to a sentence of incarceration. As discussed below, the fact that the majority of offshore tax defendants with more egregious cases have received non-imprisonment sentences further supports Dr. Mani receiving the Recommended Sentence.

## C.   The Need for the Sentence Imposed to:

### 1.   Reflect the seriousness of the offense, promote respect for the law and provide just punishment (§ 3553(a)(2)(A))

As discussed above, Dr. Mani does not dispute that the misconduct he committed was serious. However, the facts and circumstances of Dr. Mani's conduct (including the facts that only one foreign bank account was opened in one foreign bank over two years in his own name and was reported, along with his foreign income, to his accountant) render his misconduct less grave than many other similar crimes that have been prosecuted by the government.

With respect to just punishment, Dr. Mani has already paid, and will continue to pay, a substantial price for his transgressions. Financially, Dr. Mani has not only made the IRS completely whole by paying back all the taxes ($437,878) and interest ($128,239) owed, he has already paid the civil fraud and FBAR penalties -- $511,802 – representing a **financial penalty of more than 100% of the taxes originally owed**. With respect to these civil penalties, the Court does not have the power to assess them as part of a criminal sentence. Thus, if Dr. Mani had done what many tax defendants do, he would have been sentenced to pay the taxes and dragged out paying them as well as the interest during the civil

20

administrative process which can last for months or even years.  He could have also fought the imposition of the maximum civil fraud and FBAR penalties, requiring the IRS to assess them and the Department of Justice to prove them up in court.  As part of his desire to rectify his wrongs, Dr. Mani agreed to not require any of this additional government civil process after sentencing and entered into closing agreements and paid the maximum civil fraud and FBAR penalties prior to sentencing.

As set forth in his letter to the Court, Dr. Mani has also suffered and will continue to suffer immeasurably as a result of the loss of his professional reputation cultivated over the last two decades and the fact that he will be a convicted felon for the rest of his life .  In light of these severe financial penalties and collateral consequences, and taking into consideration Dr. Mani's personal background and his full acceptance of responsibility, a sentence of imprisonment is not necessary to just punishment for Dr. Mani's misconduct.[2]

### 2.   Afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B))

The sentence imposed by the Court should also be sufficient, but not greater than necessary, to adequately deter criminal conduct.  18 U.S.C. § 3553(a)(2)(B).  There can be no question that the goal of specific deterrence has already been met in this case.  In actions and words, Dr. Mani fully understands the gravity of his misconduct and has taken every step in his power to rectify his wrongs, make the IRS whole, cooperate with the government's investigation, and ensure that he will never transgress the law again. Dr. Mani's exemplary personal history and the scores of impassioned character references further show that he is not a threat to

---

[2] The Supreme Court has recognized that "probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'"  *Gall*, 552 U.S. at 44 (quoting district judge).  If sentenced to probation, Dr. Mani will be "subject to several standard conditions that substantially restrict [his] liberty."  *Id.* at 48.  These restrictions may include being required to report regularly to his probation officer, permit unannounced visits to his home, refrain from associating with any person convicted of a felony, and restrictions on his ability to vote and travel.

1  the public; a sentence of incarceration is not needed to further reinforce to him the

2  perils of violating the law.

3      Nor is a prison sentence necessary to achieve general deterrence.  Any

4  taxpayer contemplating the decision of whether to disclose a foreign bank account

5  and report foreign income who views what has happened to Dr. Mani already will

6  be adequately deterred by (1) the lifelong criminal felony conviction with all its

7  attendant consequences; (2) the over 100% civil penalties; (3) the requirement to

8  make the IRS whole by paying the tax and all interest back; (4) the requirement to

9  cooperate on every person involved with your actions; and (5) the enormous

10  damage to the professional reputation one has worked hard to build.  Adding

11  additional punishments of (6) probation, (7) home detention, and (8) 1,500 hours of

12  community service will further deter any would-be tax cheats from following Dr.

13  Mani's crooked path. A sentence of incarceration is not needed to further reinforce

14  this message.

15      Moreover, a probationary sentence itself carries a deterrent effect.  An

16  empirical analysis of the effect of different sentences on taxpayer compliance,

17  which was funded in part by the IRS, **found no difference as it pertained to**

18  **deterrence between convictions that resulted in probation and convictions that**

19  **resulted in prison; both deterred tax crimes.** It did find, however, that

20  convictions resulting only in fines (*i.e.*, in neither prison nor probation) led to

21  lower compliance. *See* Jeffrey A. Dubin, *Criminal Investigation Enforcement*

22  *Activities and Taxpayer Noncompliance*, 2004 IRS Research Conference (June

23  2004) (http://www.irs.gov/pub/irs-soi/04dubin.pdf).

24      Accordingly, the Recommended Sentence will achieve both specific and

25  general deterrence in this case.

26

27

28

DB2/ 34482678.1            MARC MANI'S SENTENCING POSITION CR 17-322-RGK

3. <u>Protect the public from future crimes of the defendant (§ 3553(a)(2)(C))</u>

Dr. Mani has no prior arrests or convictions and a previously unblemished lifelong record of honesty and integrity.  Furthermore, he has demonstrated full acceptance of responsibility and remorse for the offenses that he committed.  He does not pose a threat to the public.

4. <u>Provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner (§ 3553(a)(2)(D))</u>

There is no need to provide Dr. Mani with any educational or vocational training, medical care or other correctional treatment.

**D.    The Kinds of Sentences Available (§ 3553(a)(3))**

While the Court may impose a sentence of imprisonment, as reflected in the PSR, the Court may instead impose from one to five years of probation – with conditions including fine, restitution, or community service – in lieu of imprisonment.  *See* 18 U.S.C. § 3561(c)(1).  (PSR ¶ 86).

**E.    The Advisory Guideline Range (§ 3553(a)(4))**

As discussed above, Dr. Mani contends that the proper advisory guideline range in this case is 12-18 months.  Of course, post-*Booker*, that range is now only one of several factors that the Court must consider in its sentencing analysis. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).

**F.    Any Pertinent Policy Statement Issued By the Sentencing Commission (§ 3553(a)(5))**

With respect to pertinent policy statements, while the Sentencing Commission issued a policy statement highlighting the need for deterrence in tax cases, as explained above, both specific and general deterrence can be achieved in this case without the need for the additional punishment of a sentence of incarceration.

23

1

2

### G.     The Need to Avoid Unwarranted Sentence Disparities (§ 3553(a)(6))

The goal of avoiding unwarranted sentencing disparities, which was a principal motivating force for the Sentencing Guidelines, remains a key sentencing factor under 18 U.S.C. § 3553.  *See United States v. Ressam,* 679 F.3d 1069, 1094 (9th Cir. 2012); *see also* 28 U.S.C. § 991(b)(1)(B) (purposes of Sentencing Commission include "avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices").  In this case, a below-guidelines sentence of probation with home detention and 1,500 hours of community service is required to avoid unwarranted disparities with sentences imposed on defendants guilty of similar or more egregious misconduct.

Recent statistics from the U.S. Sentencing Commission show that of all federal tax defendants sentenced nationwide in fiscal year 2017, a substantial majority – 73.5% – was sentenced below the applicable guideline range (24.7% with the government's support and 48.8% without).  U.S. Sentencing Commission, *2015 Sourcebook of Federal Sentencing Statistics*, Table 27A (http://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2017/sourcebook-2017).  A review of court records and government press releases in several of those cases reveals that probation not only is the most commonly imposed sentence, but has also been regularly granted to defendants whose conduct involved far greater tax losses and affirmative acts of evasion than anything involved in this case.[3]

---

[3] There have been 82 taxpayers to date prosecuted since 2009 as part of the government's enforcement efforts targeting taxpayers with unreported offshore bank accounts and income.  Of those taxpayers, 68 have pleaded guilty and 14 have gone to trial.  Of the 68 that have pleaded guilty, the majority of them have received non-imprisonment sentences of probation that may have included home detention, community service or halfway house.  See Offshore

24

For example, in February 2014, billionaire (and Beanie Babies creator) H. Ty Warner was sentenced after pleading guilty to evading almost $5.6 million in taxes on more than $24.4 million in undeclared income.  *United States v. H. Ty Warner*, No. 13-cr-00731-CPK (N.D. Il.). Although Warner's net worth was over $1.7 billion and he could have paid the taxes on his offshore accounts easily, he made a conscious effort for over a decade to evade taxes and to conceal the offshore accounts from the accountants who prepared his tax returns.  The sentencing guideline range, as stipulated in Warner's plea agreement, was 46-57 months.  Noting Warner's charitable contributions and finding that "society will be best served by allowing him to continue his good works," the district court sentenced Warner to two years of probation and 500 hours of community service. This very large variance from the guideline range to a probationary sentence was affirmed on appeal, with the Seventh Circuit citing the defendant's "excellent character, as shown by his long history of charity and kindness to others," and "the isolated and uncharacteristic nature of his tax evasion."  *United States v. Warner*, 792 F.3d 847, 864 (7th Cir. 2015).  Dr. Mani's good works and charitable efforts over the past several decades are at least commensurate with Mr. Warner's efforts which were largely confined to donating to worthwhile charities; Dr. Mani will be performing life-changing surgeries on veterans and those in need of such operations.

Similarly, in February 2013, Dr. Arvind Ahuja was sentenced in the United States District Court for the Eastern District of Wisconsin, Case No. 11-CR-135, after being convicted by a jury of filing a false tax return whereby he evaded tax of $967,944.66 on undisclosed interest income of $2.76 million.  At sentencing, the government sought a prison term of 41-51 months arguing, like it has in this case,

Charges/Convictions Spreadsheet prepared by Jack Townsend, located at http://federaltaxcrimes.blogspot.com/p/offshore-charges-convictions.html.

DB2/ 34482678.1                MARC MANI'S SENTENCING POSITION CR 17-322-RGK

1    that deterrence demanded a stiff sentence of incarceration.  The defense argued for

2    a sentence of probation based, among other things, on Dr. Ahuja's years of service

3    to the community (including the needy) through the practice of medicine and the

4    significant harm that would befall others were he to be sentenced to prison and lose

5    his medical license.  The district court imposed a sentence of three years' probation

6    (including six months of house arrest and 150 hours of community service).

7        There is no reason that Dr. Mani, with his lifetime of charitable work and

8    potential ability to directly improve the lives of others dramatically, and a tax loss

9    substantially less than Dr. Ahuja's and just a small fraction of Mr. Warner's,

10   should receive a greater sentence than imposed on either Dr. Ahuja or Mr. Warner.

11   But those defendants are hardly isolated cases.  A small sampling of other

12   defendants who have received probation in tax cases – often in situations involving

13   larger accounts, greater tax losses, and highly complex affirmative acts of evasion

14   – include:

15       ● Mary Estelle Curran, charged in the United States District Court for the

16   Southern District of Florida, Case No. 9:12-CR-80206-KLR.  She pleaded guilty to

17   two counts of subscribing to false tax returns based on her failure to disclose $43

18   million in an undisclosed Swiss account, resulting in a tax loss of $667,716.

19   (Sentenced in April 2013 to one year of probation, which District Judge Kenneth

20   Ryskamp immediately revoked, resulting in, as the court stated, "five seconds of

21   probation")

22       ● Igor Olenicoff, charged in the United States District Court for the Central

23   District of California, Case No. 07-CR-227.  He controlled and hid assets in

24   undisclosed foreign accounts for at least 13 years, and filed false tax returns for

25   seven years in which he failed to disclose those foreign accounts.  Olenicoff's tax

26   liability to the IRS, including interest and penalties, totaled $52 million.

27   (Sentenced to two years of probation)

28       ● Pius Kampfen, charged in the United States District Court for the Northern

26

District of California, Case No. 3:13-cr-00369-JST.  Kampfen, an international banker for 40 years who worked in San Francisco as the senior West Coast representative for Swiss bank Julius Baer until his retirement in 2001, failed to disclose or report on his tax returns a number of accounts he controlled at UBS and other Swiss banks.  He created a British Virgin Islands entity, Albia Investments Limited, for the purpose of holding his assets in Swiss accounts and concealing his ownership interest.  When initially interviewed by the IRS, Kampfen falsely stated that he was not familiar with Albia.  Kampfen pleaded guilty to failing to disclose his foreign accounts, which were valued as high as $2.93 million; the FBAR penalty was $1.465 million.  The total offense level was 10, and the guideline range was 6-12 months; the government sought a sentence of six months' imprisonment.  (Sentenced to two years of probation with six months of home detention)

● Robert Greeley, charged in the United States District Court for the Northern District of California, Case No. 3:11-cr-00374-CRB.  A San Francisco man who managed the investment of employee benefit funds at Hewlett-Packard Co., Greeley was convicted of filing a false tax return and admitted concealing more than $15 million in two bank accounts that he held at UBS in the names of Cayman Islands nominee entities.  He also failed to report more than $734,000 in interest income that he earned in the UBS accounts.  (Sentenced to three years of probation with six months of home detention)

● John McCarthy, charged in the United States District Court for the Central District of California, Case No. 09-CR-784.  He transferred over $1 million that he illegally skimmed from his Los Angeles business into an undisclosed UBS account and regularly communicated with UBS representatives to authorize transactions with respect to his undisclosed accounts. Although McCarthy cooperated with the government, the district judge stated that she also relied on the fact that he had no prior criminal record and had otherwise "led a responsible, law-abiding life."

27

1    (Sentenced to three years of probation with six months of home detention and 300

2    hours of community service)

3         ● Paul Zabczuk, charged in the United States District Court for the Southern

4    District of Florida, Case No. 10-CR-60112.  He directed his foreign clients to make

5    payments to his company through offshore accounts he controlled in the Bahamas

6    and Switzerland, further funded those offshore accounts by disguising payments

7    made from his domestic corporation to his offshore corporation as commissions,

8    and repatriated funds to the United States through cash withdrawals at UBS

9    branches in Nassau, London, and Zurich, as well as by wiring money to the

10   Republic of China and using it to buy furniture and other antiques that were then

11   shipped to him in the United States.  According to the government, the tax loss was

12   $267,597.  Zabczuk unsuccessfully attempted to enter the OVDP.  The government

13   sought a sentence of 18 months' imprisonment based on Zabczuk's cooperation.

14   (Sentenced to three years of probation with 12 months of home detention and 150

15   hours of community service)

16        ● Steven Rubinstein, charged in the United States District Court for the

17   Southern District of Florida, Case No. 09-CR-60166.  An accountant, he

18   repatriated approximately $7 million from his undisclosed UBS accounts into the

19   United States to purchase property and build his personal residence in Boca Raton,

20   and deposited and sold more than $2 million in South African Krugerrands through

21   his UBS accounts.  The government sought a prison term of 12 months based on

22   Rubinstein's substantial assistance.  (Sentenced to three years of probation with 12

23   months of home detention)

24        ● Juergen Homann, charged in the United States District Court for the

25   District of New Jersey, Case No. 09-CR-724.  He created a nominee Hong Kong

26   corporation to hide his ownership interest in his UBS account, orchestrated a sham

27   $5 million loan to a second Hong Kong entity in order to obtain financing for his

28   United States business, and made a conscious decision not to seek out and enter

into the IRS' voluntary disclosure program.  As stated in the plea agreement, the tax loss was over $400,000.  (Sentenced to five years of probation with 300 hours of community service)

● Jules Robbins, charged in the United States District Court for the Southern District of New York, Case No. 10-CR-333.  He created a sham Hong Kong corporation to be listed as the nominal holder of his UBS accounts (which collectively contained almost $42 million) and took numerous affirmative steps to conceal his interest in those accounts from the IRS, including having his Swiss attorney receive all correspondence relating to the accounts at his law firm in Switzerland.  He pleaded guilty to five counts of filing false tax returns.  (Sentenced to one year of probation)

● Ernest Vogliano, charged in the United States District Court for the Southern District of New York, Case No. 10-CR-00327.  He opened UBS accounts in the names of Liechtenstein and Hong Kong shell corporations and, according to the United States Attorney, "went to extreme lengths to hide his income at UBS and other offshore banks."  Vogliano repatriated large sums of money from his undisclosed UBS accounts by traveling to Zurich and mailing traveler's checks from the UBS account to himself in the United States, and further used the UBS accounts to pay numerous personal expenses for himself and his wife (including transferring money to a contractor in Greece, sending money to an art gallery in Paris, and charging hundreds of thousands of dollars on credit cards linked to his UBS account).  After learning of the criminal investigation of UBS, Vogliano transferred $1 million from UBS to a Liechtenstein-based bank that did not have offices in the United States.  Vogliano pleaded guilty to one count of conspiracy and five counts of filing false tax returns.  (Sentenced to two years of probation)

● Harry Abrahamsen, charged in the United States District Court for the District of New Jersey, Case No. 10-CR-00254.  He funded his undisclosed foreign accounts with approximately $1.3 million in false and inflated expenses paid by his

29

business to a Swiss company, which expenses he then deducted on the business'

corporate tax returns.  Abrahamsen transferred his UBS accounts to a nominee

Panamanian corporation for the purpose of hiding them from the IRS.  Per the plea

agreement, the tax loss was between $325,000 and $550,000, and the stipulated

total offense level was 16, with a guideline sentencing range of 21-27 months.

(Sentenced to three years of probation with 12 months of home detention)

● Leonid Zaltsberg, charged in the United States District Court for the

District of New Jersey, Case No. 10-CR-437.  He transferred his undisclosed

foreign bank accounts to a nominee Panamanian corporation for the purpose of

hiding them from the IRS and, as found by the District Court at sentencing, "made

a conscious and calculated decision to hide money offshore."  Per the plea

agreement, the total offense level was 13, with a guideline sentencing range of 12-

18 months.  (Sentenced to four years of probation with 12 months of home

detention)

● Jacques Wajsfelner, charged in the United States District Court for the

Southern District of New York, Case No. 12-CR-00641.  A retired real estate and

advertising executive, he concealed $5.7 million in undisclosed accounts at two

Swiss banks, including one account in the name of a sham Hong Kong corporation

that he created to hide his ownership of the account from the IRS.  The tax loss

was over $419,000, and the civil FBAR penalty was over $2.8 million.  (Sentenced

to six months of probation with three months of home detention)

● Jeffrey Chatfield, charged in the United States District Court for the

Southern District of California, Case No. 10-CR-4546.  He opened a UBS account

in the name of a nominee entity, deposited $900,000 in untaxed cash and securities

that he received from his consulting work, and later transferred account assets into

another UBS account held in the name of another nominee entity.  (Sentenced to

three years of probation)

● Richard Chong, charged in the United States District Court for the

30

MARC MANI'S SENTENCING POSITION CR 17-322-RGK

Northern District of California, Case No. 3:13CR00442-001 JST.  Chong failed to pay taxes on $1.8 million held in an undisclosed foreign account and faced an advisory guideline range of 10-16 months.  At sentencing in December 2013, the district granted a downward variance based in large part on the sentences given to similarly situated defendants.  (Sentenced to two years of probation and 200 hours of community service)

● Lothar Hoess, charged in the United States District Court for the District of New Hampshire, Case No. 11-CR-154.  He deposited his business receipts into an undisclosed UBS account and used another undisclosed UBS account to pay his personal expenses.  Hoess was aware of and understood his obligation to file FBARs and report those accounts, having previously filed FBARs for an account that he controlled in Italy.  The plea agreement included a base offense level of 20 (tax loss over $400,000), a total offense level of 19, and a guideline sentencing range of 30-37 months.  Hoess' total tax liability to the IRS, including penalties and interest, was $2,033,209.  (Sentenced to three years of probation with eight months of home detention)

● Wolfgang Roessel, charged in the United States District Court for the Southern District of Florida, Case No. 12-CR-60074.  He held undisclosed accounts in nominee names at UBS and at another Swiss bank, into which he deposited foreign proceeds of his business totaling over $11.5 million.  When Roessel became aware of the government's investigation into his UBS accounts, he disclosed only the existence of the UBS accounts on his tax returns for those years and did not report the other Swiss account.  Per the plea agreement, the stipulated tax loss was $312,803, the total offense level was 17, and the guideline sentencing range was 24-30 months.  (Sentenced to eight months of home detention with three years of supervised release)

● Josephine Bhasin, charged in the United States District Court for the Eastern District of New York, Case No. 2:11-CR-00268.  She failed to disclose on

31

1   her tax return a number of foreign accounts at HSBC India valued at $8.3 million,

2   and further failed to disclose $169,000 of interest income earned on certificates of

3   deposit maintained at HSBC India.  (Sentenced to two years of probation with

4   three months of home detention and 150 hours of community service)

5          ● Rakesh Chitkara, charged in the United States District Court for the

6   District of New Jersey, Case No. 3:13-cr-00202-MLC.   He failed to disclose on

7   his tax returns his interest in at least two UBS accounts.  He also formed a

8   Bahamian corporation that he used to conceal his beneficial ownership in one of

9   the UBS accounts.  The tax loss was $27,000 and the civil FBAR penalty was

10  $839,885.  (Sentenced to one year of probation)

11         ● Roberto Cittadini, charged in the United States District Court for the

12  Western District of Washington, Case No. CR 09-0344.  A retired sales manager

13  for Boeing, he concealed nearly $2 million in undisclosed UBS accounts.  After

14  initially opening a UBS account in his own name, he transferred the assets in that

15  account to a nominee Hong Kong corporation in order to evade United States

16  reporting and withholding requirements.  (Sentenced to one year of probation with

17  six months of home detention and 200 hours of community service)

18         ● Gregory Rudolph, charged in the United States District Court for the

19  District of Massachusetts, Case No. 1:10-cr-10360-NMG.   He failed to disclose a

20  UBS account containing at least $1.5 million, and created shell companies in the

21  British Virgin Islands and in Hong Kong to assist in hiding the income from the

22  undisclosed UBS account.  (Sentenced to one year of probation with one month of

23  home detention)

24         ● Arthur Joel Eisenberg, charged in the United States District Court for the

25  Western District of Washington, Case No. 2:10-cr-00369-JCC.  He failed to

26  disclose his ownership of several UBS accounts containing a total of over $4.2

27  million.  He also authorized and caused the formation of a Hong Kong corporation

28  and transferred his assets into a UBS account in the corporation's name to conceal

1  his beneficial ownership.  Upon learning of the UBS investigation in 2008, he

2  closed his UBS account and transferred the funds to another large global Swiss

3  bank.  (Sentenced to three years of probation)

4  ● Anton Ginzburg, charged in the United States District Court for the

5  Eastern District of New York, Case No. 1:11-cr-00432-SJ.  A New York podiatrist,

6  he concealed his ownership of a UBS account containing $3.11 million and paid a

7  civil FBAR penalty of over $1.5 million.  (Sentenced to five years of probation)

8  ● Michael F. Schiavo, charged in the United States District Court for the

9  District of Massachusetts, Case No. 1:11-CR-10192-RGS.   A venture capitalist, he

10  arranged to have $99,273 in taxable income from an investment wired to an

11  undisclosed bank account in Bermuda, and failed to report the account to the IRS

12  or declare the payment on his tax return.  The tax loss was $40,624.  (Sentenced to

13  one year of probation with one month of home detention)

14  ● Humberto Gomez, charged in the United States District Court for the

15  Southern District of Florida, Case No. 1:12-CR-20198-JEM.  He filed false tax

16  returns that failed to disclose a UBS account that he held in the name of a sham

17  British Virgin Islands corporation and into which he deposited nearly $1.9 million

18  in business receipts.  (Sentenced to three years of probation)

19  Accordingly, given that the majority of similarly situated defendants with

20  even more egregious and aggravating facts received non-imprisonment sentences

21  of probation with certain conditions, in order to avoid unwarranted sentencing

22  disparities, the Court should impose the Recommended Sentence.

23  **H.    The Need to Provide Restitution to Victims of the Offense
     (§ 3553(a)(7))**

24  Dr. Mani has already paid prior to sentencing all of taxes, interest and civil

25  fraud and FBAR penalties owed and thus will not have any additional restitution

26  due and owing.

27

28

I.    **A Sentence of Probation with Home Detention and 1,500 Hours of Community Service Is Reasonable and Appropriate in this Case**

Under all the circumstances of this case and the analysis of the § 3553(a) sentencing factors set forth above, Dr. Mani respectfully submits that the Recommended Sentence is reasonable and appropriate.  Such a sentence would recognize the seriousness of Dr. Mani's offense conduct while accounting for the attendant extenuating circumstances, the mitigating aspects of the nature of his offense, his pre-indictment guilty plea, his timely, truthful and substantial cooperation, his full payment of taxes, interest and penalties prior to sentencing, his decades of being a law-abiding, productive and contributing member of society, the need to avoid unwarranted sentencing disparities among similarly situated defendants, and the need and tremendous benefit to society of having Dr. Mani serve 1,500 hours of community service with Face Forward Veterans rather than serve that time unproductively in prison.

## IV.    CONCLUSION

For the reasons set forth herein, and taking into consideration the nature and circumstances of the offense, Dr. Mani's history and personal characteristics, and all of the goals of sentencing enumerated in § 3553(a)(2), Dr. Mani respectfully requests that the Court sentence him to the Recommended Sentence of probation with home detention and 1,500 hours of community service.

DATED:  September 13, 2018          Morgan, Lewis & Bockius LLP

By:____/s/ Nathan J. Hochman_____
        Nathan J. Hochman
        Attorneys for Defendant
        Marc Mani

34

*Marc Mani*
*Letters to Hon. R. Gary Klausner*

**I N D E X**

| NAME | EXHIBIT NO. |
|------|-------------|
| Mani, Marc, M.D. | 1 |
| Alessi, David M., MD FACS (Curriculum Vitae attached) | 2 |
| Alter, Gary J., M.D. | 3 |
| Barens, Lynda | 4 |
| Day, Kelly | 5 |
| Handel, Neal, M.D. F.A.C.S. | 6 |
| Johnson, Chad S., Esq. | 7 |
| Khan, M. H., M.D. | 8 |
| Malnotra, Rocky | 9 |
| Rothman, Mark | 10 |
| Casalino, Alex | 11 |